1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4

5    MARY MUTO,                          Case No.  20-cv-06232-SK

6              Plaintiff,

7         v.                             **ORDER REGARDING MOTION FOR**
                                         **SUMMARY JUDGMENT**
8    COUNTY OF MENDOCINO,
                                         Regarding Docket Nos. 38, 38-14; 56
9              Defendant.

10        Defendant County of Mendocino ("Defendant") moves for summary judgment in this

11   matter.  (Dkt. Nos. 38, 56.)  Having considered the submissions of the parties, the record in the

12   case, and the relevant legal authorities, and having had the benefit of oral argument, the Court

13   HEREBY GRANTS Defendant's motion for summary judgment, for the reasons set forth below.

14        The Court further GRANTS Defendant's request for judicial notice.  (Dkt. No. 38-14.)

15   The Court OVERRULES objections by Plaintiff Mary Muto ("Plaintiff") to Defendant's evidence

16   (Dkt. No. 43 at page 13) and OVERRULES Defendant's objections to Plaintiff's evidence (Dkt.

17   No.47 at 8, 14).

18                              **BACKGROUND**

19        Starting in February 2015, Plaintiff was employed by Defendant as a Social Worker

20   Assistant II in the Department of Social Services' Adult Protective Services Program and was later

21   promoted to Social Worker III.  (Dkt. No. 43-1 (Muto Decl.).)[1]  The job description for Social

22   Worker III included as examples of required "knowledge, skills, and abilities" the following: the

23   ability to "work constructively within a community setting and effectively use appropriate

24   resources and services," to "establish and maintain professional working relationships with agency

25   staff, client and others," to "work effectively in emotionally charged or stressful

26   setting/emergencies," and "accept and use consultative supervision and constructive feedback."

27   ───────────────────

28        [1]  Where there is a factual dispute, the Court will provide both versions and the factual
     citations.  Unless otherwise noted, this Order will include only undisputed facts.

United States District Court
Northern District of California

(*Id.* (Muto Decl. Ex. A).)

In 2017, Plaintiff began experiencing problems with memory, lack of focus, and mood swings.  (Dkt. No. 43-1 (Muto Decl. ¶ 2).)  On July 5, 2017, Plaintiff received a Letter of Reprimand for inappropriate behavior and failure to exercise professional behavior after she referred to another coworker, Christine Kelly ("Kelly"), as "bitch."  (Dkt. No. 38-11 (Rivera Decl. Ex. B); Dkt. No. 38-9 (Kelly Decl. Ex. A).)  In her June 30, 2021 deposition, Plaintiff described the conversation with her co-worker Kelly:

> She was outside when it happened. She was not – she had not given me the paperwork I had asked for, and I went outside – I followed her outside and I said, "I don't understand, I thought we were doing better and I don't understand why you're such a bitch to me." And I – this has been clarified many times, my thought to hers. I did not call her a bitch and I was walking away from her at the time and I said – and I was saying kind of under –under my breath, but out loud, "I just don't understand why she's such a bitch to me" because I really didn't understand. I thought we had it all solved.

(Dkt. No. 50 (Blanton Decl. Ex. A at 119:4-16).)

Also in 2017, Plaintiff's coworker Chela Ruano ("Ruano") "witnessed Plaintiff arguing and yelling at [Cathy] Lonergan on several occasions."  (Dkt. No. 38-12 (Ruano Decl. ¶ 5).)  Ruano also saw Plaintiff yelling at other coworkers, including James "Rusty" Petrella, and saw Plaintiff "yelling at clients and service providers over the phone."  (*Id.* ¶¶ 10-11.)

That same year, Plaintiff "lashed out and yelled at" Ruano so much that Ruano started crying.  (*Id.* ¶ 6.)  In that incident, even though Plaintiff was not Ruano's supervisor, Plaintiff yelled at Ruano for failing to tell Plaintiff where Ruano would be and for failing to obtain permission for home visits for clients.  (*Id.*)  Plaintiff admitted at deposition that she "snapped" at Ruano on that occasion and that she behaved as if she were Ruano's supervisor.  (Dkt. No. 50 (Blanton Decl. Ex. A at 116:7-117:12, 122:2-15).)

Plaintiff also yelled at colleague Teresa Baumeister ("Baumeister"), and Plaintiff stomped her feet and slammed the door after yelling at her.  (Dkt. No. 38-2 (Baumeister Decl. ¶ 4).)  Ruano witnessed this event.  (Dkt. No. 38-12 (Ruano Decl. ¶ 10).)  Plaintiff also made inappropriate comments to Baumeister at work.  Once Plaintiff told Baumeister that her shoes "must have been

United States District Court
Northern District of California

an impulse buy" and that Baumeister appeared to be the "most depressed unhappy person" that Plaintiff had ever met.  (Dkt. No. 38-2 (Baumeister Decl. ¶ 3).)  If Plaintiff had continued working with Defendant, Baumeister would have resigned from her job or transferred because she could no longer work with Plaintiff.  (*Id.* ¶ 6.)

On many occasions, Plaintiff's supervisors talked to Plaintiff about her behavior with coworkers.  (Dkt. No. 38-10 (Mitchell Decl. ¶¶ 2, 4-6); Dkt. No. 38-11 (Rivera Decl. ¶¶ 5, 7-8), Dkt. No. 50 (Blanton Decl. Ex. B at 64:14-65:22, 80:18-81:9, 117:9-118:11).)  Lynnette Mitchell ("Mitchell") was Plaintiff's direct supervisor part of the time that Plaintiff worked with Defendant, and she was later the supervisor of Plaintiff's supervisor during part of the time.  (Dkt. No. 38-10 (Mitchell Decl. ¶ 2).)  Kelsey Rivera ("Rivera") was also Plaintiff's supervisor during part of the time. (Dkt. No. 38-11 (Rivera Decl. ¶ 3).)

On July 9, 2017, Plaintiff wrote an email to Mitchell, then her direct supervisor, explaining that coworker Kelly had taken some action without informing Plaintiff.  (Dkt. No. 43-1 (Muto Decl. Ex. F).)

On October 25, 2017, Plaintiff received a written performance review in which she was rated as either "Standard" or "Above Standard" in all categories of her job except for one rating of "Weak" and one rating of "Unsatisfactory" (in "[g]etting along with fellow employees").  (*Id.* (Muto Decl. Ex. B).)

During 2017, Mitchell addressed several incidents with Plaintiff: an incident in which Plaintiff told colleague Lonergan that Lonergan had to choose between being a friend to Plaintiff or another coworker, an incident in which Plaintiff "verbally attacked" coworker Jody Johnston ("Johnston"), an incident or incidents in which Plaintiff made unnecessary and negative comments, and the incident in which Plaintiff made Ruano cry, described above.  (Dkt. 38-10 (Mitchell Decl. ¶ 5).)  Plaintiff's supervisors also talked with Plaintiff about other behavior, such as using profanity at work and refusing to log in her location on the "in/out board. "  (Dkt. 38-10 (Mitchell Decl. ¶ 5 and Ex. A); Dkt. No. 50 (Blanton Decl. Ex. B at 65:8-66:12, 114: 11-18, 115: 13-25 and Ex. 6).)

In September and then again in December of 2017, Plaintiff received a diagnosis of mild

3

cognitive impairment from a medical doctor.  (Dkt. No. 43-1 (Muto Decl. Exs. C-D).)  Plaintiff told her supervisor at the time, Kristina Bryce ("Bryce"), about her diagnosis "after the Holidays that same year" and told Mitchell about her diagnosis in the spring of 2018.  (*Id.* ¶ 11.)[2]

Plaintiff alleges, with no additional facts, that, after "learning of the medical testing and the results, Defendant started to fabricate workplace issues with me."  (*Id.* ¶ 13.)

On November 5, 2018, Plaintiff received a written performance review in which she was rated as either "Standard" or "Above Standard" in all categories of her job except for a rating of "weak" in "[g]etting along with fellow employees.  (*Id.* (Muto Decl. Ex. B.))  The review also described her as a "skilled social worker."  (*Id.*)

In November 2018, there was another "incident" between Plaintiff and Kelly.  (Dkt. No. 38-10 (Mitchell Decl. ¶ 8).)  Plaintiff allegedly followed Kelly outside and then back into the building and "yelled at her."  (*Id.*)  On December 3, 2018, Kelly filed a complaint about Plaintiff's conduct.  (Dkt. 38-9 (Kelly Decl. Ex. A).)  Plaintiff disputed Kelly's "perspective" and disputed the characterization as "yelling" but admitted that the "dates and situations" in Kelly's complaint were accurate and that she did get easily frustrated and emotional.  (Dkt. No. 50 (Blanton Decl. Ex. A at 162: 4-15, 167:6-168:23), Dkt. 38-6 (Cranmer Dec. Ex. B at 483:7- 484:24).)

On December 3, 2018, Plaintiff also wrote a letter to Bryce, Mitchell, and Human Resources about Kelly's behavior in walking away from Plaintiff.  (Dkt. No. 43-1 (Muto Decl. Ex. G).)  According to Plaintiff, although Kelly told Plaintiff that she hates Plaintiff's voice and hates Plaintiff, no action was taken against Kelly, and instead Plaintiff was required to take additional actions to avoid Kelly.  (Dkt. No. 43-1 (Muto Decl. ¶¶ 14-16).)

Plaintiff was placed on a Corrective Action Plan after the incident with Kelly.  (Dkt. No. 38-10 (Mitchell Decl. Ex. B).)

Plaintiff also "flew into a rage" with Theresa Bloyd ("Bloyd") shortly after January 2019.  (Dkt. 38-4 (Bloyd Decl. ¶ 6).)  After working with Plaintiff for only ten days, Bloyd "had to take a mental health day" because Plaintiff was such a difficult co-worker.  (*Id.* ¶ 7.)  Plaintiff also "flew into a rage again" after another incident with Bloyd in which Plaintiff "was just suddenly irate."

---

[2] Mitchell denies knowing of Plaintiff's medical condition (Dkt. No. 38-10 (Mitchell Decl. ¶ 13).)

United States District Court
Northern District of California

(*Id.* ¶ 8.)  At that time, Plaintiff "yelled and slammed down her hand on the desk."  (*Id.*)

Before the period of the Corrective Action Plan ended, another complaint about Plaintiff's conduct, based on an event on March 13, 2019, arose.  (Dkt. No. 38-12 (Ruano Decl. ¶ 7).)  On March 13, 2019, Plaintiff again "lashed out" at Ruano.  (*Id.*)  Plaintiff asked a question: "Who are you talking to about lunch?"  (*Id.*)  When no one answered the question, "Plaintiff just lost it and started yelling" at Ruano, even though Ruano asked her three times not to yell at her.  (*Id.*)  Bloyd witnessed this event in which Plaintiff "was screaming and yelling at" Ruano with her finger in her face, while Ruano bent away physically from Plaintiff.  (Dkt. 38-4 (Bloyd Decl. ¶ 10).)  Plaintiff, while yelling, was standing approximately a foot or foot and a half away from Ruano, and Ruano thought that she might have to physically defend herself because Plaintiff was so angry.  (Dkt. 38-12 (Ruano Decl. ¶ 7).)  Ruano had never been treated as Plaintiff treated her and would have left her job if Plaintiff had returned to work.  (*Id.*¶ 9.)  Bloyd describes this incident as "violent because of the intensity at which Plaintiff yelled and screamed at Ruano."  (Dkt. 38-4 (Bloyd Decl. ¶ 10).)  Lynette Cader ("Cader"), in a separate office, was on the telephone with Bloyd and heard Plaintiff's "raised voice" that sounded angry; Cader corroborated many of Ruano's statements about the interaction with Plaintiff.  (Dkt. 38-5 (Cader Decl. ¶ 3).)

Ruano then received a call from her supervisor Bryce, who asked if Ruano was okay.  (Dkt. 38-12 (Ruano Decl. ¶ 8).)  Bryce told Ruano that she had received an anonymous complaint about Plaintiff's behavior.  (*Id.*)  Ruano submitted a complaint on March 14, 2019.  (Dkt. 38-12 (Ruano Decl. Ex. A).)  Bloyd originally made a "verbal" complaint to her supervisor, who asked that Bloyd submit something in writing.  (Dkt. 38-4 (Bloyd Decl. ¶ 11).)  Bloyd did so and reported earlier problems with Plaintiff's behavior in the same report.  (*Id.* (Bloyd Decl. Ex. A).)  Cader also reported the incident "verbally" to Mitchell, who asked Cader to send an email.  (Dkt. 38-5 (Cader Decl. ¶ 3).)  Cader did so.  (*Id.* (Cader Decl. Ex. A).)

Plaintiff addresses the March 13, 2019 incident with Ruano by stating only that there was an "incident" in which she became "frustrated."  (Dkt. 43-1 (Muto Decl. ¶ 19).)  Plaintiff further explains: "I was unable to control my reaction due to my condition, and I snapped at her."  (*Id.*)  Plaintiff does not otherwise dispute Ruano's, Bloyd's, or Cader's characterization of the event.

On March 14, 2019, Defendant placed Plaintiff on paid administrative leave.  (Dkt. 38-13

(Schurtz Decl. Ex. B).)

Defendant investigated the incident leading to Plaintiff's placement on administrative leave. (Dkt. 38-7 (Crapo Decl. Ex. A).) Human Resources Analyst Heather Crapo ("Crapo") assisted her supervisor, Human Resources Manager Denise Bartolomei ("Bartolomei") in conducting the investigation. (*Id.* (Crapo Decl. ¶ 2).) During the investigation, coworkers raised complaints other than the March 13, 2019 incident. (*Id.* (Crapo Decl. Ex. A).) Crapo interviewed six of Plaintiff's coworkers and supervisors and interviewed Plaintiff in recorded interviews that Crapo summarized. (*Id.*) The summaries from Plaintiff's coworkers were consistent with the declarations described above. (*Id.*)

After Plaintiff was placed on administrative leave, Plaintiff's supervisor Mitchell learned of other incidents in which Plaintiff had treated her coworkers poorly, but those coworkers had not previously reported those incidents. (Dkt. No. 38-10 (Mitchell Decl. ¶ 11).)

After Plaintiff was placed on administrative leave, Plaintiff "worked with" Christine Naber, Ph.D., ("Naber") to obtain coping mechanisms such as reducing stress, taking cognitive mindfulness training, and beginning a medication routine[.]" (Dkt. No. 43-1 (Muto Decl. ¶ 12).) Plaintiff met with Naber on May 15, 2019, and September 3, 2019.[3]

On July 22, 2019, Defendant issued a Notice of Intent to Take Disciplinary Action ("Notice") – termination of Plaintiff's employment. (Dkt. No. 38-8 (Emery Decl. Ex. A).) The Notice indicated that the charges against Plaintiff were incompetence or inefficiency, failure to meet reasonable work performance standards and requirements, and hostile or discourteous treatment of the public or other employees. (*Id.*) In addition to the problems with her coworkers, the Notice stated that Plaintiff was not available while on paid administrative leave and that she had authorized County funds to pay for an Adult Protective Services client without obtaining the

---

[3] In her deposition, Plaintiff stated that she saw Naber when she was on paid administrative leave. (Dkt. No. 50 (Blanton Decl. Ex. A at 31:9-11).) Also, in an undated letter, Naber identified two dates of treatment in 2019: May 15, 2019, and September 3, 2019. (Dkt. No. 43-1 (Muto Decl. Ex. E).) In a separate letter dated September 27, 2019, Naber only identified September 3, 2019, as a date of treatment for Plaintiff. (Dkt. No. 56-1 (Blanton Decl. Ex. 1); Dkt. No. 57-1 (Jaffee Decl. Ex. 5).). The records that Muto produced in response to a third-party subpoena show that Plaintiff was referred to Muto on March 19, 2019, and first treated her in May, 2019. (Dkt. No. 50 (Blanton Decl. Ex. A).)

1    proper approval.  (*Id*.)

2         On August 5, 2019, Defendant held a hearing pursuant to *Skelly v. State Pers. Bd*., 15 Cal.

3    3d 194, 203 (1975) (the "*Skelly* hearing")[4], after which the "*Skelly* officer" determined that

4    terminating Plaintiff's employment was appropriate.  (Dkt. No. 38-13 (Schurtz Decl. ¶ 7).)  At the

5    *Skelly* hearing, Plaintiff testified but did not make the argument that she had a disability that

6    prevented her from performing her job adequately.  (*Id.* (Schurtz Decl. Ex. C).)  The *Skelly*

7    hearing in Plaintiff's case resulted in an Order of Disciplinary Action terminating Plaintiff's

8    employment effective August 26, 2019.  (Dkt. No. 38-6 (Cranmer Decl. Ex. G).)

9         Plaintiff then appealed the Order of Disciplinary Action to the Mendocino County Civil

10   Service Commission, which held another hearing on December 18-19, 2019.  (*Id.* (Cranmer Decl.

11   Ex. B).)  After the hearing, the Commission upheld the Order of Disciplinary Action, dated

12   August 15, 2019.  (*Id.* (Cranmer Decl. ¶ 4 and Ex. B).)  Plaintiff did not file a writ of mandamus

13   after that decision.  (*Id.* (Cranmer Decl. ¶ 5).)

## PROCEDURAL HISTORY

15        Defendant filed this motion for summary judgment on December 20, 2021.  (Dkt. No. 38.)

16   The Court extended the briefing schedule at the request of the parties.  (Dkt. No. 44.)  On March 1,

17   2022, Plaintiff requested an extension of time to disclose expert witnesses.  (Dkt. No. 53.)  The

18   hearing on the motion for summary judgment was held on March 7, 2022.  (Dkt. No. 54.)  The day

19   after the hearing, on March 8, 2022, the Court extended the deadline for expert disclosures to

20   April 8, 2022, and also allowed the parties to submit additional briefs on the summary judgment

21   motion.  (Dkt. No. 55.)  The order also noted that the deadline for expert discovery would be

22   extended if the case went forward and that parties could engage in expert discovery if needed.

23   (*Id*.)  The parties submitted their additional briefs on April 15, 2022, and April 22, 2022.  (Dkt.

     Nos. 56, 57)).

## DISCUSSION

25        A principal purpose of the summary judgment procedure is to identify and dispose of

---

[4] In *Skelly*, the California Supreme Court ruled that public employees in California have a right to a pre-termination hearing.  15 Cal. 3d at 215.

United States District Court
Northern District of California

factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, set forth specific facts showing that there is a genuine issue for trial. *Id.* In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In addition, the party seeking to establish a genuine issue of material fact must take care to adequately point a court to the evidence precluding summary judgment because a court is "not required to comb the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation omitted).

If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

United States District Court
Northern District of California

8

1

2

**A.      Claims for Age Discrimination.**

3              Defendant argued that Plaintiff failed to meet her burden to oppose summary judgment on

4     her claims for age discrimination under both federal and state law.  Under both California state

5     and federal law, a plaintiff opposing summary judgment can establish a *prima facie* case for age

6     discrimination by showing: that she suffered an adverse employment action; that, at the time of the

7     adverse action, she was 40 years or older; that she was satisfactorily performing her job; and that a

8     younger employee replaced her.  *Rose v. Wells Fargo & Co*., 902 F.2d 1417, 1421 (9th Cir. 1990)

9     (federal Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1) ("ADEA")); *Hersant v.*

10    *Dep't of Soc. Serv*., 57 Cal. App. 4th 997, 1003 (1997) (California state law).  Once a plaintiff

11    makes this *prima facie* showing, the defendant must show a legitimate, nondiscriminatory motive

12    for the decision.  *Rose*, 902 F.2d at 1420; *Hersant*, 57 Cal. App. 4th at 1003.  If the employer

13    makes this showing, the burden shifts back to the plaintiff to show pretext.  *Rose*, 902 F.2d at

14    1420-21; *Hersant*, 57 Cal. App. 4th at 1003.  Here, Defendant proffered evidence that an

15    employee older than Plaintiff replaced her after Defendant terminated Plaintiff's employment.

16    (Dkt. No. 38-1 (Baker Decl. ¶¶ 1-3); Dkt. No. 38-11 (Rivera Decl. ¶ 14).)  Plaintiff cited no

17    evidence to rebut this evidence and presented no evidence to show pretext in her opposition

18    briefing.  Thus, Plaintiff failed to make her *prima facie* showing.  At the hearing on this matter,

19    Plaintiff conceded that she has no evidence to rebut Defendant's evidence, and Plaintiff withdrew

20    her claims for age discrimination under both federal and state law.  The Court thus GRANTS

21    summary judgment in favor of Defendant on these two claims for age discrimination under federal

22    and state law (Claims One and Two in the Complaint).

**B.      Preclusive Effect of State Agency Decision on Claims for Disability Discrimination.**

23             Defendant also argued that *res judicata* bars all of Plaintiff's claims under California state

24    law and federal law.  Because Plaintiff withdrew her claims for age discrimination under both

25    federal and California state law, this analysis applies only to Plaintiff's claims for disability

26    discrimination under federal and California state law.[5]  A state court record or judgment has

27    _____

28    　　　[5]The Court notes that, although Plaintiff withdrew her claim for age discrimination under
federal law for the separate reasons noted above, the Mendocino County Civil Service
Commission's findings are not binding on the claim for age discrimination under federal law.

1    preclusive effect in federal court under 28 U.S.C. §1738.  *Univ. of Tenn. v. Elliott*, 478 U.S. 788,

2    794 (1986).  In addition, in the absence of a statute, there are common law principles regarding the

3    preclusive effect of state court records or judgments.  *Id*.  Even if there is no state court judgment,

4    a decision of a state's administrative proceeding can have preclusive effect on later federal claims

5    under certain circumstances.  *Id*.  The Supreme Court in *Elliott* explained that, "when a state

6    agency 'acting in a judicial capacity . . . resolves disputed issue of fact properly before it which the

7    parties have had adequate opportunity to litigate,'" then "federal courts must give the agency's

8    factfinding the same preclusive effect to which it would be entitled in the State's courts."  *Id*. at

9    799 (citing *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422 (1966)).

10           The determination whether Plaintiff's disability discrimination claims are barred by the

11   principle of *res judicata* thus requires analysis of the preclusive effect of a state administrative

12   proceeding under California law.  Under California law, where "a public employee pursues

13   administrative civil service remedies, receives an adverse finding, and fails to have the finding set

14   aside through judicial review procedures, the adverse finding is binding on discrimination claims."

15   *Johnson v. City of Loma Linda*, 24 Cal. 4th 61, 76 (2000).  California courts also require that the

16   finding of the state administrative proceeding is binding only if the administrative process adheres

17   to the standards of fairness set forth in *Utah Construction*, *supra*.  *Miller v. Cty. of Santa Clara*, 39

18   F.3d 1030, 1033 (9th Cir. 1994).  *Utah Construction* requires that the administrative agency have

19   acted in a judicial capacity to resolve disputed issues of fact properly before it which the parties

20   have had an adequate opportunity to litigate.  384 U.S. at 422.

21           Here, an administrative *Skelly* hearing resulted in an adverse finding against Plaintiff, a

22   public employee.  (Dkt. 38-6 (Cramer Decl. Ex. G).)  That finding took the form of an Order of

23   Disciplinary Action which upheld Defendant's decision to terminate Plaintiff's employment.

24   (*Id.*)  Plaintiff appealed the Order of Disciplinary Action to the Mendocino County Civil Service

25   Commission, which held another hearing on December 18-19, 2019.  (*Id.* (Cramer Decl. Ex. B).)

26

27   _____

28   *Astoria Federal Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 110 (1991) ("We reach the same
     result here, for the Age Act, too, carries an implication that the federal courts should recognize no
     preclusion by state administrative findings with respect to age-discrimination claims.")

United States District Court
Northern District of California

After the hearing, the Commission upheld the Order of Disciplinary Action, dated August 15, 2019.  (*Id.* (Cranmer Decl. ¶ 4 and Ex. B).)  Plaintiff did not file a *writ of mandamus* appealing that decision.  (*Id.* (Cranmer Decl. ¶ 5).)  The ruling of the administrative proceeding thus became binding.  *Johnson*, 24 Cal. 4th at 69-70.  The issue in the state administrative proceeding was the "same primary right" to "continued employment" that is at issue here, and thus the decision of the administrative proceeding is binding on this Court for the state disability discrimination claim.  *Miller*, 39 F.3d at 1034.

At the hearing on this matter, Plaintiff conceded that the state agency's finding is binding on the California state law claims.  Because the state agency's finding is binding on the California state law claims and because Plaintiff withdrew her claim for age discrimination under both federal and state law, the sole question remains whether the state agency's finding is binding on Plaintiff's claim for disability discrimination under federal law.  Although no Ninth Circuit case has addressed this issue directly, the Court finds that there is no preclusive effect of a state administrative proceeding on the federal claim for disability discrimination.  Other circuits have addressed this issue and reached the same conclusion.  *See*, *e.g.*, *Thomas v. Contoocook Valley Sch. Distr.*, 150 F.3d 31, 39 n.5 (1st Cir. 1998); *Kosakow v. New Rochelle Radiology Assoc., P.C.*, 274 F.3d 706, 735-36 (2d Cir. 2001); *Smith v. Perkins Bd. of Ed.*, 708 F.3d 821, 828 (6th Cir. 2013).  The courts in those cases applied the reasoning of *Elliott*, where the Supreme Court found that a state administrative decision is not binding on later Title VII claims because Title VII provides that the Equal Employment Commission is required to give only "substantial weight to findings and orders made by State or local authorities in proceedings commended under State or local" employment discrimination law.  *Elliott*, 478 U.S. at 795.  The language of Title VII shows that Congress intended for Title VII to allow trial *de novo* after an administrative hearing and to overcome the presumption of *res judicata* under common law, and allowing preclusive effect for rulings of state agencies would be contrary to the rationale of the statute.  *Id.*  The ADA incorporates Title VII's procedural requirements, including the right to trial *de novo*.  42 U.S.C. §12117(a).  Title VII and the ADA are identical in this regard, so the rationale of *Elliott* should also apply to ADA claims.  Thus, the Court finds that the state administrative finding against

1    Plaintiff is not binding on her claim for disability discrimination under federal law.

2    **C.      Claim for Disability Discrimination under Federal Law.**

3          Plaintiff alleges that Defendant terminated her employment because of her disability.[6]  In

4    her Complaint, she originally alleged that she was performing her job adequately but that

5    Defendant, after learning of her disability, fabricated reasons to terminate her employment to

6    avoid paying her costly retirement benefits.  (Dkt. No. 1.)  In opposing this motion, Plaintiff

7    shifted to an alternate theory that she was sometimes "inappropriate" in her communications with

8    her coworkers or that she had problems with "reactivity to co-workers" (Dkt. No. 43 at page 18),

9    but that her behavior did not rise to the level to require termination of her employment.  Finally,

10   Plaintiff argues that, even if she had been unable to get along with her coworkers, her inability to

11   do so was caused by her disability, and any adverse action taken against her for failure to get along

12   with her coworkers was an adverse action based on her disability.  *See*, *e.g.*, *Dark v. Curry*

13   *County*, 451 F.3d 1078 (9th Cir. 2006) (termination of employment based on action caused by

14   disability is adverse action "because of" disability); *Humphrey v. Memorial Hospital Ass'n*, 239

15   F.3d 1128, 1139-1140 (9th Cir. 2001) ("with few exceptions, conduct resulting from a disability is

16   considered to be part of the disability, rather than a separate basis for termination.").

17         Under any of the three theories Plaintiff asserts, to prevail on her disability discrimination

18   claim under the ADA, Plaintiff must show sufficient facts to make a *prima facie* case of the

19   following: (1) that she was disabled within the meaning of the ADA, (2) that she was qualified for

20   the job, *i.e.*, that she could perform the essential functions of the job at issue, with or without a

21   reasonable accommodation, and (3) that her employer terminated her employment because of her

22   disability.  *Wellington v. Lyon Cty. Sch. Dist.*, 187 F.3d 1150, 1154 (9th Cir. 1999) (internal

23   citation omitted).  Once she makes that prima facie showing, the burden shifts to Defendant to

24

25         _____

26         [6] Plaintiff does not allege in her Complaint or in opposing summary judgment that
     Defendant failed to provide accommodations in response to her request, and Plaintiff conceded at
     the hearing on this motion that she never made such a request.  Plaintiff also does not allege
27   failure to engage in the interactive process in her Complaint or in opposing summary judgment
     and conceded at the hearing on this motion that she does not assert this claim.  The only claim
28   Plaintiff asserts under the ADA is that Defendant terminated her employment because of her
     disability.

United States District Court
Northern District of California

show a legitimate, non-discriminatory motive for the adverse action.  *Norton v. PHC-Elko, Inc*., 46 F. Supp. 3d 1079, 1086-87 (D. Nev. 2014) (citing *McDonnell Douglas Corp. v Green*, 411 U.S. 792, 802-04 (1973); *see also Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003).  If Defendant meets that burden, then the burden shifts back to Plaintiff to show that the reason is pretextual.  *Id*.

### 1.    Ability to Perform Job Adequately.

The undisputed evidence shows that Plaintiff was not performing her job adequately, and Plaintiff points to no admissible evidence to show that her coworkers' complaints were fabricated. Defendant argues that Plaintiff fails to show that she was qualified for her job because she could not perform an essential function of her job – getting along with coworkers.  Defendant submitted evidence that getting along with coworkers is an essential function of the job of Social Worker. (Dkt. No. 43-1 (Muto Decl. Ex. A); Dkt. No. 38-3 (Emery Decl. ¶¶ 3, 8).)  That standard is also established under the law.  *Mayo v. PCC Structurals Inc*., 795 F.3d 941, 944 (9th Cir. 2015) (an "essential function of almost every job is the ability to appropriate handle stress and interact with others").  Plaintiff also conceded at the hearing on this matter that getting along with coworkers is an essential function of Plaintiff's job.

There is no factual dispute that Plaintiff did not get along with her coworkers and actually antagonized them.  Although Plaintiff submitted some evidence to rebut the evidence of many employees who wrote of her many problems working with them, there are many unrebutted statements, described in detail above.  Plaintiff does not provide any evidence to counter all of the allegations contained in the declarations submitted for this motion and which Defendant considered before making the decision to terminate Plaintiff's employment.  The complaints that Plaintiff did not rebut were numerous and alone justified termination of Plaintiff's employment. The weight and number of complaints about her from her co-workers is stunning in the aggregate. Two of her co-workers actually said that they would not have returned to their jobs if Plaintiff had returned to her job.

The first major dispute that occurred was Plaintiff's dispute with her coworker Kelly. Plaintiff contends that Kelly was at fault.  However, Plaintiff does not deny that she used the word

"bitch" in talking to or referring to Kelly, as she admitted in her deposition that she used that word in talking with Kelly and in walking away from her, and there is no mention of any profanity Kelly used in her encounter with Plaintiff.  (Dkt. No. 50 (Blanton Decl. Ex. A).)  Plaintiff cannot distance herself from her deposition testimony.  *See*, *e.g.*, *Radobenko v. Automated Equip. Corp.*, 520 F. 2d 540, 544 (9th Cir. 1975) (a plaintiff cannot "create" an "issue of fact by an affidavit contradicting . . . prior deposition testimony.").

The second major dispute was Plaintiff's interaction with her colleague Ruano on March 13, 2019.  Plaintiff does not dispute that she raised her voice with Ruano, and that she yelled at Ruano for one to one and a half minutes, with her face close to Ruano's face, so loudly that a coworker on the phone in another office could hear it.  (*Compare* Dkt. No. 43-1 *with* Dkt. Nos. 38-4, 38-5, 38-12.)  Plaintiff does not dispute that not only Ruano but also Bloyd and Cader filed complaints about Plaintiff's behavior.  (*Id.*)

Plaintiff has no response at all to the detailed descriptions from several of her coworkers, described above, of many occasions of hostility where Plaintiff argued with and yelled at coworker Lonergan; lashed out at Ruano, causing her to cry on another occasion in 2017; yelled at coworker Petrella; yelled at clients and service providers over the phone; yelled at Baumeister; stamped her feet and slammed the door after yelling at Baumeister; made inappropriate comments to Baumeister about her clothing and affect; and flew into a rage with Bloyd on at least two occasions.  (Dkt. Nos. 38-2, 38-4, 38-5, 38-6.)  These undisputed facts show that Plaintiff did not perform the essential function of her job to get along with coworkers.

Instead of providing evidence to rebut the specific, numerous allegations of her hostile interactions with colleagues, Plaintiff makes three arguments.  First, she argues that un-named people pressured all of the declarants into lying or exaggerating their allegations.  Second, she argues that the investigation that Defendant conducted was tainted, and she submits an expert report criticizing the manner in which Defendant conducted that investigation.  Third, she argues that she was able to perform the essential functions of her job with accommodations.

       **i.**    **Plaintiff's Allegation that All Coworkers Lied.**

Plaintiff's main argument is that all of her coworkers were pressured into either lying or

exaggerating their complaints about her. (Dkt. No. 43-1 (Muto Decl. ¶ 17).) She provides no other facts to support this sweeping statement. (*Id.*) Plaintiff alleges, with no citation to specific facts, that her supervisors encouraged her coworkers to fabricate charges against her so that Defendant could terminate her employment. (*Id.* (Muto Decl. ¶ 20).) Plaintiff states that several un-named coworkers told her that they had no issues with her and that they were unaware of any issues with her. (*Id.*) In contrast, the coworkers who submitted complaints about Plaintiff or investigated complaints stated that they never were asked or never asked anyone to fabricate or exaggerate complaints against Plaintiff. (Dkt. No. 38-2 (Baumeister Decl. ¶ 5); Dkt. No. 38-4 (Bloyd Decl. ¶ 14); Dkt. No. 38-9 (Kelly Decl. ¶ 6); Dkt. No. 38-10 (Mitchell Decl. ¶ 14); Dkt. No. 38-11 (Rivera Decl. ¶ 12); Dkt. No. 38-12 (Ruano Decl. ¶ 12)).

In the face of these specific denials, Plaintiff provides no evidence other than her speculation that other employees were pressured into lying or exaggerating their complaints about her. "To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso v. Gen. Synamics C4 Syt., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (rejecting speculation that other employees "poisoned" the decisionmaker against plaintiff in employment decision). Plaintiff does not meet her burden here.

### ii.    Alleged Flaws in Defendant's Investigation.

Plaintiff challenges the method in which Defendant's investigation was conducted, but those challenges are not sufficient to overcome the sworn declarations submitted by her coworkers that show that she did not get along with her coworkers. Plaintiff's coworkers submitted detailed, specific declarations for this motion that create the undisputed facts listed above. The Court need not rely upon the investigation to show these undisputed facts because the declarations, which are admissible, support the undisputed facts. The Court concludes that the undisputed evidence shows that Plaintiff was not able to perform the essential function of her job of getting along with coworkers.

Moreover, even if the investigation were flawed, those flaws do not undermine Defendant's good faith belief that the complaints were accurate. *See*, *e.g.*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (internal citation and quotation omitted)

United States District Court
Northern District of California

1    ("courts only require that an employer honestly believed its reason for its actions, even if is reason

2    is foolish or trivial or even baseless"). Here, decisionmaker Emery based the decision to terminate

3    Plaintiff's employment both on the investigation and on the documentation collected by Plaintiff's

4    supervisors about Plaintiff's behavior. (Dkt. 38-8 (Emery Decl. ¶ 5).) Later, the Skelly officer

5    made his decision to uphold the termination of Plaintiff's employment after hearing that Plaintiff

6    did not deny misconduct, and he based his decision on the evidence of misconduct that was

7    reported in the investigation and the extensive documentation of Plaintiff's behavior. (Dkt. 38-13

8    (Schurtz Decl. ¶¶ 5, 7).) Plaintiff cannot point to evidence showing that the belief, even if

9    mistaken, was dishonest.

10          Because the undisputed facts show that Plaintiff cannot meet one element of her claim (that

11   she could perform the essential functions of her job), the next question is thus whether Plaintiff

12   could perform the essential functions of her job with reasonable accommodations.

13                    **iii.    Ability to Perform Job with Accommodations.**

14          Plaintiff argues that she was able to perform her job with accommodations. However, the

15   only evidence she points to is not sufficient to meet her burden on summary judgment. Plaintiff

16   points to the September 27, 2019 report and undated letter from Naber ("Naber Report and

17   Letter") to support her argument that she could perform her job with accommodations.[7] (Dkt. No.

18   43-1 (Muto Decl. Ex. E); Dkt. No. 56-1 (Blanton Decl. Ex. 1); Dkt. No. 57-1 (Jaffee Decl. Ex. 5).)

19                    **a.    Admissibility of Naber Report and Letter Because of Late
                            Disclosure.**

20          Defendant objects to the admissibility of the Naber Report and Letter because Plaintiff

21   allegedly disclosed them after the deadline and because they are hearsay. Defendant argues that

22   the Naber Report and Letter are not admissible because Plaintiff did not provide a written report

23   from Naber. On March 8, 2022, the Court issued an Order extending the deadline for expert

24   disclosure until April 8, 2022. (Dkt. No. 55.) On April 8, 2022, Plaintiff disclosed Naber as a

25   non-retained expert and provided the subject and summary of her opinion. (Dkt. No. 56-1

26   (Blanton Decl. Ex. 1).) Plaintiff met the new deadline set by the Court. Additionally, in the

27

28          ───────────────

                    [7] The parties submitted the two Naber documents in these three declarations.

United States District Court
Northern District of California

1    further briefing permitted by the same Order, Plaintiff indicated that the materials underlying

2    Naber's opinion were produced to Defendant on December 4, 2020.  (Dkt. No. 51-1 (Jaffee Decl.

3    ¶ 2).)  Under Federal Rule of Civil Procedure 26(a)(2)(C), Plaintiff was only required to provide

4    the subject matter and a summary of the facts and opinions on which Naber would testify, which

5    Plaintiff provided in her April 8, 2022 disclosure.  Even earlier on December 4, 2020, Plaintiff had

6    produced Naber's underlying documents (the undated report and the September 27, 2019 letter) as

7    part of her initial disclosures and identified Naber as a potential witness in the Initial Disclosures

8    on the same date.  (Dkt. No. 57-1 (Jaffee Decl. ¶ 3; Exs. 5-6).)  Late disclosure thus does not bar

9    consideration of the Naber Report and Letter.

10                    **b.      Admissibility of Naber Report and Letter under Hearsay Rules.**

11       Defendant also argues that the Naber Report and Letter constitute inadmissible hearsay.  It

12   is axiomatic that the opinion of an expert witness is not hearsay.  Finally, the form of the content

13   does not control the admissibility of evidence for summary judgment.  *Fraser v. Goodale*, 342

14   F.3d 1032, 1036-37 (9th Cir. 2003).  If called as an expert witness at trial, Naber could provide her

15   opinion.  And even if there were hearsay contained in the Naber Report and Letter, the exception

16   for statements for medical diagnosis or treatment under Federal Rule of Evidence 803(4) applies.

17   Thus, the Court can consider the Naber Report and Letter for this motion.

18                    **c.      Opinions in Naber Report and Letter of September 27, 2019.**

19       The opinions in the Naber Report and Letter do not show that Plaintiff could perform the

20   essential functions of her job with reasonable accommodations.  In her undated report, Naber

21   wrote about Plaintiff:

22              *With respect to questions concerning work, it is noted that the*
23              *evaluation performed was not an evaluation of the ability to do work*
                *competently.* Nonetheless, it is suggested that Ms. Muto's current
24              cognitive functioning is weaker than her premorbid functioning, and
                that her job is likely to be very demanding, as a result. Work
25              disability should be considered due to the degree of cognitive
                impairment. *Alternatively, accommodations for increased time and*
26              *adequate supervision could be tried.*

27              Specifically, issues with persistence *could be addressed* by use of
28              alarm systems to cue follow thru [sic] or thru [sic] monitoring by a

United States District Court
Northern District of California

supervisor for task completion. Issues with memory retrieval *could be compensated* for by use of calendars, verbal reminders, and alarms to assist in prompting recall.  In addition, verbal memory strengths will assist her in compensation. Executive difficulties *could be assisted* by providing Ms. Muto with step-by-step task lists. In addition, tasks should be allowed to be completed before assigning new duties, as this will make issues with cognitive flexibility less problematic. Giving additional time for assignments will also assist with underlying cognitive inefficiencies. If Ms. Muto appears to become agitated, *she could be cued* to perform a physical reset (e.g., snapping her fingers, clapping her hands, etc.), as such activities can derail the behavioral upset that can be triggered by an underlying neurodegenerative order.  *If such reasonable accommodations cannot be accomplished in Ms. Muto's current place of employment, then disability is supported*. Her condition is progressive, and disability would be warranted if accommodations are not available or if compensatory techniques cease to assist in accommodating neurocognitive challenges.

(Dkt. No. 43-1 (Muto Decl. Ex. E)) (emphasis added).

In the letter dated September 27, 2019, Naber wrote that Plaintiff had been diagnosed with a mild cognitive impairment by UCSF in 2017 and opined: "It is highly likely that the behavioral difficulties that have occurred at work are due to her diagnosis."  (Dkt. No. 56-1 (Blanton Decl. Ex. 1); Dkt. No. 57-1 (Jaffee Decl. Ex. 5).)

There are four reasons why Naber's assessment does not show that Muto could perform the essential functions of her job with accommodations.  First, Naber explicitly states that her evaluation is not "an evaluation of the ability to do work competently."  (Dkt. No. 43-1 (Muto Decl. Ex. E).)  Thus, Naber's own disclaimer prevents the Court from relying upon it to find that Plaintiff could perform the essential functions of her job with accommodations.  Second, Naber's assessment is equivocal in stating that certain accommodations "could be tried" or that certain problems "could be addressed" with certain accommodations.  (*Id*.)  Again, this evidence is not sufficient to show that Plaintiff could perform the essential functions of her job with accommodations because the comments are suggestions about what might work.  Third, Naber's report does not address the key problem: Plaintiff's inability to get along with her coworkers. There is no indication in the report that any accommodation would help Plaintiff get along with her coworkers, as the report discusses only memory issues, general agitation, and persistence.

1    Finally, Naber implicitly admits that these suggested accommodations may not be appropriate in

2    Plaintiff's job, when Naber opines: "If such reasonable accommodations cannot be accomplished

3    in Ms. Muto's current place of employment, then disability is supported."  (*Id.*)

4          Given that the undisputed evidence shows that Plaintiff could not perform the essential

5    functions of her job with reasonable accommodations, summary adjudication is warranted for

6    Defendant on this basis alone.  However, the Court will examine the third element of the claim:

7    whether Defendant terminated Plaintiff's employment "because of" her disability.

8          **2.       Termination of Employment "Because of Disability."**

9          As noted above, there is no evidence to support Plaintiff's theory that Defendant took

10   action against her in order to cut off her retirement benefits, and the only evidence shows that

11   Defendant terminated her employment because she could not get along with coworkers.  The

12   undisputed evidence does not support Plaintiff's last theory – that her disability caused her to fail

13   to get along with coworkers.

14         Defendant argues that Plaintiff cannot assert this new theory of discrimination that she met

15   the essential standards of her job but that Defendant fabricated excuses to fire her after Defendant

16   learned of her disability, because Plaintiff did not assert this theory until opposing summary

17   judgment.  Under *Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292 (9th Cir. 2000), a party

18   cannot assert a new theory of discrimination on summary judgment if not pled in the complaint.

19   In *Coleman*, the court considered a summary judgment motion in a case for age discrimination

20   where plaintiffs had failed to argue disparate impact until the motion for summary judgment was

21   filed.  *Id*. at 1291-1292.  The Court noted that an employee can proceed in an age discrimination

22   claim "under two theories of liability: disparate treatment or disparate impact."  *Id*. at 1291.  The

23   plaintiffs in *Coleman* had only alleged disparate treatment and had not disclosed the theory of

24   disparate impact until opposing the motion for summary judgment and thus were barred from

25   doing so.  *Id.* at 1291-1294.

26         In her Complaint, Plaintiff clearly advanced a theory of disability discrimination which is

27   different from the one she now asserts.  Plaintiff alleged: "Plaintiff got along well with her co-

28   workers and acted professionally at all times, both in the office and out in the field."  (Dkt. No. 1

at page 3.)  "Following learning of the medical testing and its results, Defendant started to fabricate workplace issues with" Plaintiff "in an effort to reprimand her."  (Dkt. No. 1 at page 4.)  Defendant allegedly "called co-workers into meetings to discuss" Plaintiff "in an effort to create false complaints about her."  (*Id.*)  When she lost her job, Plaintiff was six months from vesting of her "employment benefits." (*Id.*)  Plaintiff alleged in her Complaint that Defendant used the false complaints as part of a campaign to avoid providing costly benefits and accommodations to Plaintiff.  (*Id.*)  Moreover, when Plaintiff testified in her deposition, she explained why she was fired, and she did not say that she was fired because her disability caused her to fail to get along with co-workers.  (Dkt. 50 (Blanton Decl. Ex. A at 102:18-103:13).)  Plaintiff is estopped from asserting this new theory of discrimination, but even if the Court considers this theory, it also fails for the same reasons described above.  The key to this theory is that Defendant fabricated reasons to terminate Plaintiff's employment, but as described above, the undisputed evidence shows that Plaintiff lost her job because she was not able to get along with coworkers.

Plaintiff argues that, even if Defendant terminated her employment based partially on her disability, she can make her claim.  She is mistaken.  Unlike other claims for discrimination under federal law and unlike California state law disability law, a plaintiff in a federal disability action under the ADA must prove that the adverse employment action would not have happened but for the disability.  *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105-1107 (9th Cir. 2019).  In *Murray*, the Ninth Circuit specifically overruled the holding in *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053 (9th Cir. 2005) "that a plaintiff bringing a discrimination claim under Title I of the ADA need show only that a disability was a motivating factor of the adverse employment action."  *Id.* at 1105.  "We hold instead that an ADA discrimination plaintiff bringing a claim under 42 U.S.C. § 12112 must show that the adverse employment action would not have occurred but for the disability."  *Id.*  Plaintiff cannot make such a showing here.

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment for Defendant.

**IT IS SO ORDERED**.

Dated: May 3, 2022



_____
SALLIE KIM
United States Magistrate Judge